**Dominic QUIGLEY, Plaintiff,**

v.

**AUSTEEL LEMONT COMPANY, INC., Defendant.**

**No. 98 C 4945.**

United States District Court,
N.D. Illinois,
Eastern Division.

Jan. 20, 2000.

Joseph R. Mazzone, Thomas P. Palacek, Schenk, Duffy, McNamara, Phelan, Carey & Ford, Ltd., Joliet, IL, for plaintiff.

Elaine Saphier Fox, Richard Patrick McArdle, D'Ancona & Pflaum, Chicago, IL, Robert C. Weissflach, Jaeckle, Fleischmann & Mugel, LLP, Buffalo, NY, for defendant.

## MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.

Before the court is defendant Austeel Lemont Company, Incorporated's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). For the following reasons, the court grants defendant's motion.

## I. BACKGROUND[1]

Plaintiff Dominic Quigley ("Quigley") worked for the defendant Austeel Lemont Company, Incorporated ("Austeel") from January 17, 1994 to September 2, 1997 in its plant located in Lemont, Illinois. Austeel is a Delaware corporation engaged in the production and sale of steel products.

Austeel originally hired Quigley as a material handler. On February 21, 1994, Quigley became a caster. About six months later, on September 5, 1994, Austeel promoted Quigley to the position of Team Leader Casting. A little over a month later, Austeel gave Quigley another promotion. This promotion was to the position of Casting Supervisor. As Casting Supervisor, Quigley oversaw employees in the melt shop, coordinated with the furnace side of the melt shop, kept time sheets for the employees who did not punch a time clock, determined whether employee absences were excusable and payable, and disciplined employees.

About four months later, Gerald L. Rich ("Rich"), Acting Melt Shop Superintendent, evaluated Quigley's performance as a supervisor on February 7, 1995. In the "cooperativeness" category, Quigley received a "fair" rating. This rating indicated that Quigley was: "Inclined to be overly independent. Sometimes curt in dealing with others. Not a good team worker,

---

1. Unless otherwise indicated, the following facts are taken from the parties Local General Rule 12(M) and 12(N) Statements. Since the time of the filings of the briefs for this motion, the court has renamed and renumbered Local General Rule 12. The new name and number is Local Rule 56.1. Local Rule 56.1(a)(3) is the new counterpart of Local General Rule 12(M); Local Rule 56.1(b)(3) is the new counterpart of Local General Rule 12(N). However, to be consistent with the parties' filings, the court will refer to the parties' Local General Rule 12(M) and 12(N) Statements.

causes some friction." (D.Ex. E at 3.) In addition, Rich wrote that Quigley is "willing to listen to others," however, he needs to improve his tact. (*Id.*)

Following this, Quigley completed a self-appraisal form. In his self-appraisal, Quigley stated that he needed (1) "training on how to develop a better understanding about situations with employees" and (2) stress management courses. (D.Ex. F at 3.)

As a supervisor, Austeel required Quigley to attend supervisor training classes. At these classes, Austeel provided information on being an effective supervisor and on interacting and communicating with subordinates. Out of ten classes, Quigley attended only six. Based upon Quigley's attendance, Wayne Dawson ("Dawson"), Quigley's supervisor, issued a written warning to Quigley on July 9, 1997. This warning noted Quigley's lack of attendance and also his inappropriate behavior of drinking beer by Austeel's gate and of contradicting other Austeel officials in front of employees. Despite this warning, Quigley missed another class on August 1st.

On August 3rd and 4th of 1997, Quigley failed to come to work. Dawson documented this in an Employee Contact Report on August 8th. This report states that on August 4th, Mrs. Quigley, Quigley's wife, called Rich and informed him that Quigley was in the hospital, but she did not know when he would be released. The parties dispute whether Mrs. Quigley informed Rich of the reasons for Quigley's hospitalization—severe depression and chemical dependency—at this time.

Also, on August 8, 1997, Quigley called Gregg Lawson ("Lawson"), Human Resource Supervisor. The parties, however, dispute the subject matter of this telephone conversation. Quigley alleges that the call was to inform Austeel of his in-patient treatment at BroMenn Healthcare for drug abuse. (Pl.'s 12(N) Statement at

7, ¶¶ 40–42.) However, Austeel asserts that during the call Quigley did not mention the reason for his hospitalization; his concern was over the status of his job. (D.'s 12(M) Statement at 11, ¶¶ 40–42.)

On this same day, Dawson, Rich and Lawson decided to temporarily promote another employee to Quigley's supervisory position. Austeel alleges that the bases for this decision were Quigley's interpersonal problems with other employees, Quigley's failure to attend the supervisor classes, and Quigley's inability to perform his supervisory functions. (*Id.* at 12, ¶ 44.) Furthermore, Austeel contends that Quigley's supervisors were unaware of Quigley's enrollment in a drug treatment program at the time of this decision. (*Id.* at 12, ¶ 45.) Quigley, however, asserts that the basis for the decision to promote another employee to Quigley's supervisory position was his admission to BroMenn Healthcare for in-patient treatment. (Pl.'s 12(N) Statement at 8, ¶ 45.)

Quigley returned to work on August 25, 1997 and provided documentation of his in-patient treatment and his aftercare program. Following Quigley's return, Austeel issued a warning to Quigley after he drove down the plant road at a high speed and recklessly passed other vehicles.[2] Although, he admits to receiving a warning, Quigley contends that he was never involved in any driving incidents. (Pl.'s Dep. at 143, ¶¶ 12–23.) Austeel also alleges that after his return, "Quigley did not perform his assigned tasks, but instead wandered around the plant complaining about his perceived mistreatment at the hands of the Company." (D.'s 12(M) Statement at 20, ¶ 80.) According to Austeel, it terminated Quigley's employment based upon the above incidents and Quigley's prior disciplinary history. (*Id.* at 21, ¶ 81.)

On August 11, 1998, Quigley filed a two-count complaint against Austeel. Count I was a claim for disability discrimination pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et*

---

**2.** The parties dispute whether this warning was written or oral. (D.'s 12(M) Statement at 20, ¶ 77; Pl.'s 12(N) Statement at 10, ¶ 77.)

*seq.*, and Count II was a claim for breach of contract pursuant to 28 U.S.C. § 1367.

On February 23, 1999, Quigley moved to amend his complaint. The court granted this motion and Quigley filed his Amended Complaint on March 18, 1999. The Amended Complaint consists of three counts. Both Count I and Count II are claims for disability discrimination under the ADA and Count III is a claim for breach of contract pursuant to 28 U.S.C. § 1367. Count I alleges that Austeel violated the ADA by terminating Quigley's employment because of his status as a recovering drug addict.[3] Count II alleges that Austeel violated the ADA by terminating Quigley's employment because of a perceived disability. Count III alleges that Austeel breached its employment agreement with Quigley by demoting him and terminating his employment.

The matter is currently before the court on Austeel's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). Austeel contends that it is entitled to judgment as a matter of law on Count I and Count II because (1) Quigley is not a "qualified individual with a disability" under the ADA and (2) even if Quigley is a "qualified individual with a disability," his disability does not substantially limit any major life activity. Austeel also contends that it is entitled to judgment as a matter of law on Count III because (1) the employment agreement is a management directive not a contract, and (2) even if it is a contract, Austeel has not violated the terms of it.

## II. DISCUSSION

### A. Standard for deciding a motion for summary judgment

A motion for summary judgment is proper "if the pleadings, depositions, an-

swers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Smith v. Severn*, 129 F.3d 419, 425 (7th Cir.1997).

The burden is on the moving party to show that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. Once the moving party presents a prima facie showing that he is entitled to judgment as a matter of law, the non-moving party may not rest upon the mere allegations or denials in its pleadings but must set forth specific facts showing that a genuine issue for trial exists. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 256–57, 106 S.Ct. 2505; *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir.1989).

### B. Counts I and II—ADA claims

Austeel contends that Quigley has not satisfied his burden in establishing his employment discrimination case under the ADA. More specifically, Austeel alleges that Quigley has not established a claim based on the ADA because Quigley is not a "qualified individual with a disability."

The ADA prohibits covered entities[4] from discriminating against a "qualified

---

3. Both parties also address Quigley's demotion in their summary judgment briefs. However, in his complaint, Quigley never alleges that Austeel violated the ADA when it demoted him. This court does not need to address Quigley's demotion as a claim under the ADA because the Seventh Circuit has found that subsequent assertions in other submissions to the court do not substitute for missing allega-

tions in the complaint. *See Kedzierski v. Kedzierski*, 899 F.2d 681, 683 (7th Cir.1990). However, this court advises Quigley that even if he had brought the claim, it would fail because Quigley cannot establish that he is disabled within the meaning of the ADA. *See* Part II.B.

4. A covered entity is "an employer, employment agency, labor organization, or joint la-

individual with a disability because of the disability." 42 U.S.C. § 12112(a). A "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* § 12111(8).

As in any other employment discrimination case, Quigley must establish that Austeel terminated his employment in violation of the ADA by either direct or indirect means. *See DeLuca v. Winer Indus., Inc.,* 53 F.3d 793, 797 (7th Cir.1995). Quigley does not set forth any direct evidence that Austeel discharged him because of a disability or because Austeel regarded him as disabled; instead, he provides circumstantial evidence. Thus, this court will examine Quigley's evidence within the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see Leffel v. Valley Financial Servs.,* 113 F.3d 787, 792 (7th Cir.1997) ("Although this analysis derives from Title VII cases, [the Seventh Circuit finds] ... no reason ... not to apply it to ADA claims.").

Under *McDonnell Douglas,* Quigley must first establish, by a preponderance of the evidence, a prima facie case of employment discrimination. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. To establish a prima facie case, Quigley must show: (1) he is disabled within the meaning of the ADA; (2) his work performance met Austeel's legitimate expectations; (3) he was subjected to an adverse employment action; and (4) the surrounding circumstances indicate that his disability was the reason for the adverse employment action. *See Patterson v. Chicago Assoc. for Retarded Citizens,* 150 F.3d 719, 725 (7th Cir.1998). If Quigley establishes a prima facie case, the burden of production shifts to Austeel to articulate a legitimate, nondiscriminatory reason for its allegedly bi-

ased employment decision. *See Gorbitz v. Corvilla, Inc.,* 196 F.3d 879, 882 (7th Cir. 1999). If Austeel meets its burden, Quigley must show, by a preponderance of the evidence, that Austeel's stated reason is nothing more than pretext. *See Leffel,* 113 F.3d at 792.

### 1. Whether Quigley's past drug abuse is a "disability" under the ADA

In this case, Austeel contends that Quigley fails to establish his prima facie case in both Count I and Count II because he fails to establish the first element—a disability within the meaning of the ADA. In order to survive Austeel's motion for summary judgment, Quigley must show that he suffers from a "disability" as the term is defined by the ADA. *See Homeyer v. Stanley Tulchin Assocs., Inc.,* 91 F.3d 959, 961 (7th Cir.1996). The ADA defines a "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Thus, for Quigley to establish the first element of his prima facie case, he must either (1) have an actual disability; (2) have a record of a disability; or (3) be regarded as having a disability. *Sutton v. United Airlines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 2144, 144 L.Ed.2d 450 (1999). The ADA's definition of a "disability" does not include an individual "who is currently engaging in the illegal use of drugs." 42 U.S.C. § 12114(a). However, the ADA creates a safe-harbor provision for individuals who have successfully completed or are participating in a supervised drug rehabilitation program and are no longer using illegal drugs. *See id.* § 12114(b).

■ Quigley asserts that he is a "qualified individual with a disability" under the ADA, because, although he previously abused illegal drugs, he successfully completed a supervised drug treatment pro-

bor-management committee." 42 U.S.C. § 12111(2). As an employer, Austeel fits within the definition of a covered entity. Fur-

thermore, neither party disputes that Austeel is a covered entity.

gram and is no longer using any illegal drugs. Thus, he alleges that he fits within the safe-harbor provision. Austeel, however, contends that Quigley is not a "qualified individual with a disability" under the ADA, because Quigley's drug use is too current to place him within the safe-harbor provision.

Quigley relies on the term "stable" to bring himself under the safe-harbor protection of the ADA. He also relies upon the possible factual dispute as to his "stability" to contend that the court cannot rule on the issue of current drug use in this summary judgment motion. However, the ADA does not rely upon "stability" as a definition for current drug use, nor has any court interpreting the ADA. Quigley's reliance on *McDaniel v. Mississippi Baptist Medical Center*, 877 F.Supp. 321 (S.D.Miss.1994), for the proposition that the plaintiff's stability is part of the determination as to whether he is a current drug user is misplaced. The determination is based upon the length of the plaintiff's recovery not the stability. This is evident from reading more than just the sentence upon which Quigley continuously relies. After reviewing the legislative history, the court in *McDaniel* states:

> As shown by the evidence, a supervised rehabilitation program can continue long past inpatient treatment and a definition of "no longer engaging in such use" can be read to mean that the person has been in recovery long enough to have become stable. The court finds that Congress intended for this exception to mean that the recovery must be for some longer period [which was two and a half to three weeks] than Plaintiff has presented here in this case, that this exception applies to a long term recovery program, and to a long term abstinence from drug use, not an immediate one.

*Id.* at 327–28. In this case, Quigley's inpatient recovery program lasted for ten days and he was drug free for a total period of one month before Austeel terminated his employment. This certainly does not qualify as the intended long term

recovery. *See Baustian v. State of Louisiana*, 910 F.Supp. 274, 276–77 (E.D.La. 1996) (finding that a drug-free period of seven weeks before termination was not sufficiently long enough under the ADA); *see also Collings v. Longview Fibre Co.*, 63 F.3d 828, 833 (9th Cir.1995) ("As the regulations indicate ... 'the term 'currently engaging' is not intended to be limited to the use of drugs on the days of, or within a matter of days or weeks before, the employment action in question. Rather, the provision is intended to apply to the illegal use of drugs that has occurred recently enough to indicate that the individual is actively engaged in such conduct.'" Thus, plaintiff's drug involvement within the weeks and months prior to termination indicates current use. (citing 29 C.F.R. § 1630.3 App.)); *Wormley v. Arkla, Inc.*, 871 F.Supp. 1079, 1084 (E.D.Ark.1994) ("[E]ntering a rehabilitation program does not immediately convert a "current" user into an individual with a disability protected under the ADA."). Therefore, Quigley's treatment does not place him within the safe-harbor provision for "current" drug use, and thus, Quigley is not disabled within the meaning of the ADA. Accordingly, Quigley has failed to establish the first element of his prima facie case for both Count I and Count II.

However, even if Quigley's rehabilitation program was sufficiently long enough under the ADA, he still fails under Count I to establish that he is a qualified individual with a disability under the ADA because he has not shown that his alleged disability substantially limits a major life activity and under Count II to establish that Austeel regarded Quigley's disability as substantially limiting a major life activity. The court will first address the additional failure under Count I and then will address the additional failure under Count II.

### 2. *Whether Quigley's disability substantially limits a major life activity*

■ In order to survive Austeel's motion for summary judgment on Count I,

Quigley must not only establish that he suffers from a disability as defined by the ADA, but also, that his disability substantially limits a major life activity. 42 U.S.C. § 12102(2). Quigley has failed to do so.

Quigley has failed to assert in his Amended Complaint that his alleged disability substantially limits any major life activity. "EEOC regulations interpret the ADA to define the phrase 'major life activities' to include 'functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'" *Patterson*, 150 F.3d at 725 (quoting 29 C.F.R. § 1630.2(j)(3)(i)). The only one of these 'major life activities' even mentioned in his Amended Complaint and summary judgment response is working.[5] However, in his Amended Complaint, Quigley asserts: "At no time during the period of ... [his] employment with Austeel did his disability impact his ability to properly complete the duties assigned him as an employee of Austeel." (Am.Compl. at 3, ¶ 3; *see also* D.'s 12(M) Statement at 13–14, ¶¶ 52–53 (stating that his drug use did not affect his work).) Because Quigley admits that his drug use did *not* impact his work, Quigley has failed to establish that his alleged disability substantially limits the major life activity of working. Thus, Quigley has again failed to meet his burden of establishing his prima facie case. Accordingly, the court grants Austeel's motion for summary judgment on Count I of Quigley's Amended Complaint.

### 3. *Whether Austeel regarded Quigley's disability as substantially limiting a major life activity*

■ In order to survive Austeel's summary judgment motion on Count II, Quigley must establish that Austeel regarded him as having a disability that substantially limits a major life activity. · In other words, Quigley must show that Austeel mistakenly believes "either that ... [he] has a substantially limiting impairment that ... [he] does not have or that ... [he] has a substantially limiting impairment when, in fact, the impairment is not so limiting." *Sutton*, 119 S.Ct. at 2150. It seems that Quigley is arguing that Austeel regarded his alleged disability to substantially limit the major life activity of working.

With respect to the major life activity of working, Quigley must show that Austeel regarded him as unable to perform a broad class of jobs. *See id.* at 2151; *Skorup v. Modern Door Corp.*, 153 F.3d 512, 515 (7th Cir.1998). In this case, Quigley returned to work after his in-patient treatment and Austeel adjusted Quigley's work schedule to accommodate his aftercare program. Thus, because Austeel placed Quigley in another job, Austeel did not regard Quigley as disabled within the meaning of the ADA. *See Feldman v. American Mem'l Life Ins. Co.*, No. 96 C 3371, 1998 WL 102663, at *5 (N.D.Ill. Mar.3, 1998). Furthermore, Quigley has not presented this court with any evidence that Austeel regarded him as unable to perform a broad class of jobs. Quigley points only to a statement allegedly made by Lawson and a separate statement allegedly made by Dawson which indicate that both Lawson and Dawson believe that someone who has abused drugs in the past would continually abuse drugs.[6] Assuming that these statements are admissible, these statements do not demonstrate that Austeel regarded Quigley's disability as sub-

---

5. The Supreme Court recently expressed concern over the classification of "working" as a "major life activity." *See Sutton*, 119 S.Ct. at 2151. However, because (1) neither party disputes the classification, (2) Quigley has not demonstrated that his drug abuse substantially limits his ability to work, and (3) previous Seventh Circuit decisions have treated "working" as a major life activity, the court will not address this concern. *See Schneiker v. Fortis Ins. Co.*, 200 F.3d 1055, 1060 n. 2 (7th Cir. 2000).

6. The court doubts the admissibility of these out-of-court statements. *See* FED.R.EVID. 801(c) & (d)(2). Austeel, however, has not properly objected to the admissibility of this evidence. Thus, the court will not rule on the admissibility at this time.

stantially limiting a major life activity. The most they indicate is a perceived disability and a perceived disability alone "does not rise to the level of a protected disability under the ADA." *See Robb v. Horizon Credit Union,* 66 F.Supp.2d 913, 919 (C.D.Ill.1999) (citing *Duff v. Lobdell–Emery Mfg. Co.,* 926 F.Supp. 799, 807–08 (N.D.Ind.1996)). Thus, Quigley has again failed to meet his burden of establishing a prima facie case.[7] Accordingly, the court grants Austeel's motion for summary judgment on Count II of Quigley's Amended Complaint.

### C. Count III—Breach of contract claim

In Count III, Quigley alleges that Austeel breached its employment agreement entitled "Policy Against Drugs and Alcohol in the Workplace" ("policy") with Quigley when it demoted him and terminated his employment. Austeel, however, asserts that this policy was not a contract but instead a management directive.

■ Under Illinois law,[8] an employment agreement is assumed to be an "at-will" arrangement which the employer or employee can terminate at any time and for any reason. *Martin v. Federal Life Ins. Co.,* 109 Ill.App.3d 596, 65 Ill.Dec. 143, 440 N.E.2d 998, 1002 (1982). This assumption can be rebutted by the terms of an explicit contract if (1) "the language of the policy statement . . . contain[s] a promise clear enough that an employee would reasonably believe that an offer has been made;" (2) "the statement . . . [is] disseminated to the employee in such a manner that the employee is aware of its contents and reasonably believes it to be an offer;" and (3) "the employee . . . commence[es] or continu[ues] to work after learning of the policy statement." *Duldulao v. Saint Mary of Nazareth Hosp. Ctr.,* 115 Ill.2d 482, 106 Ill.Dec. 8, 505 N.E.2d 314, 318 (1987). Thus, the first question is whether the agreement contains "a clear and explicit" promise of other than at-will employment. *See Hultquist v. Hartman,* No. 94 C 424, 1994 WL 383952, at *3 (N.D.Ill. July 20, 1994).

■ In this case, Quigley has not presented any evidence that this policy contains a "clear and explicit" promise that Austeel made an offer of tenured employment. The language in the policy upon which Quigley relies states: "Employees who voluntarily request assistance in dealing with a personal drug or alcohol problem may participate in a rehabilitation program, without jeopardizing their continued employment." (Pl.'s Am.Compl. at 6–7, ¶ 30.) This statement does not guarantee or offer Quigley continued employment and cannot be construed as establishing any contractual rights. Furthermore, even if Quigley had presented this court with evidence that this policy created an employment contract, this count would fail. Austeel terminated Quigley's employment for misconduct not for entering a rehabilitation program. Thus, Austeel did not violate the policy. Accordingly, the court grants Austeel's motion for summary judgment on Count III of Quigley's Amended Complaint.

### CONCLUSION

For the foregoing reasons, the court grants Austeel's motion for summary judgment. Final judgment in this case is entered in favor of the defendant Austeel

---

7. In addition, Quigley has presented no evidence that his work performance met Austeel's legitimate expectations or that Austeel's stated reason for demoting him and terminating his employment is pretextual. *See Leffel,* 113 F.3d at 792; *see also Miller v. Champaign Community Unit Sch. Dist.,* 983 F.Supp. 1201, 1207 (C.D.Ill.1997) ("'[Plaintiff] has failed to offer any evidence that the . . . [defendant's] stated reason is pretextual, and his claim under the ADA's 'regarded as' disabled prong must fail.'").

8. Although neither party has addressed the choice of law issue, the court finds that both parties assent to the application of Illinois law. The court bases this decision on both Austeel's and Quigley's citation of Illinois case law in support of their arguments.

Lemont Company, Incorporated and against plaintiff Dominic Quigley.